Sandra Demoruelle
P.O. Box 588
Naalehu, HI 96772-0588
Telephone: 808/929-9244
Email: naalehutheatre@yahoo.com

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
01 March 2021 8:52 AM lrs
Michelle Rynne, Clerk of Court

**CASE NO. CV20-00147 LEK-RT**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| **SANDRA LEE DEMORUELLE,** *Pro Se* )<br>**PLAINTIFF** )<br> )<br>- v. - )<br> )<br>**JANE NISHIDA,** or her successors**,** in her<br>official capacity as Acting Administrator of<br>the United States Environmental Protection<br>Agency. )<br>**DEFENDANT** )<br> ) | **SECOND AMENDED COMPLAINT;<br>CERTIFICATE OF SERVICE**<br><br>**Jury Trial: No** |

## SECOND AMENDED COMPLAINT

1)      PLAINTIFF SANDRA LEE DEMORUELLE *Pro Se*, filed its original Complaint for

Declaratory and Injunctive Relief on April 6, 2020 and an Amended Complaint on May, 5, 2020.

With leave of the Court (Doc. 70, Page 18), Plaintiff gratefully files this Second Amended

Complaint by March 1, 2021.

2)      Plaintiff seeks to provide clear and convincing evidence that the United

States Environmental Protection Agency ("EPA") has not properly discharged its

duties under National Environmental Policy Act ("NEPA") 42 U.S.C. Sec. 4321

*et seq.* and its implementing regulations, 40 C.F.R. Sec. 1500.1 – 1508.28 [2019],

as well as the EPA procedures for implementing NEPA, 40 C.F.R. Part 6.

3)      Plaintiff challenges the EPA's NEPA procedural decision, which is a distinct challenge to an agency's decision to forgo a major procedural step in its path to its ultimate action of providing grant funding for the Pahala large capacity cesspool project (the NEPA "action" requiring environmental impact review).

4)      EPA and the County of Hawaii prepared a Final Environmental Assessment ("EA") to meet the content and procedural requirements of NEPA and issued a final Finding of No Significant Impact ("FONSI"), a "final decision" indicating the proposed action will not have a significant effect on the environment (40 C.F.R. Sec.1508.13), signed by Tomas Torres, EPA Region IX Director Water Division, on February 20, 2020. (FONSI (February 20, 2020) available at https://www.epa.gov/uic/pahala-community-large-capacity-cesspool-replacement-project-county-hawaii-hi).

5)      Plaintiff claims the *Environmental Assessment for the Pahala Large Capacity Cesspool (LCC) Replacement Project EPA Grant XP-96942401 Volumes 1 and 2* (947 pages total) ("Final EA") dated February 20, 2020, and the accompanying Finding of No Significant Impact ("FONSI") as published in the March 8, 2020, Office of Environmental Quality Control ("OEQC") *The Environmental Notice* ("*TEN*") do, in fact, meet the significance criteria set forth in NEPA.

6)      Plaintiff claims the EPA FONSI document does not explain why "an action" will not have a significant effect on the natural and human environment in the area of Pahala.  Instead, EPA only considered "the **environmental impacts** of

the **construction** of the [Pahala] treatment and disposal facility …." EPA FONSI

Page 2. (emphasis added).

7)      The EPA FONSI Alternatives Analysis and Selection of the Preferred Alternative

section presents the County's preferred technology option of a centralized wastewater

"treatment and disposal facility" without discussion of the alternatives of simpler and less

costly technology options of decentralized "modular wastewater treatment options."

8)      While the Final EA acknowledges two advantages of package plants over the

preferred lagoon system, namely "a small footprint and associated capital cost," the three

types of facilities and the associated costs were never considered in evaluation of

alternatives and package plants were just lumped into a group as being "too complex"

and "lack of operational flexibility under changing conditions."

9)      In fact, County of Hawaii Department of Environmental Management ("DEM") Director

Ramzi Mansour, said "the two sewer plants in Ka'u are too much, especially in light of the limits

on growth in that area of Ka'u."  Nancy Cook Lauer, Alternatives sought for Ka'u sewer project,

*West Hawaii Today*, January 29, 2021, A1 -A7, at Page A7.

10)     Investigating an alternative to the Pahala treatment and disposal plant, Director Mansour

stated: "Modular units such as those made by Newterra and Bioxica can be assembled on-site

and added to or subtracted from as the needs of the community change."  *Id.*

11)     The Final EA and FONSI failed to identify that the selection of appropriate alternative

technologies was driven by the sole EPA "need" of closing the illegal large capacity cesspools

("LCCs") in Ka'u as soon as possible.

12)     Technology options for wastewater treatment are determined by the rate of daily

wastewater flow and the degree to which the wastewater is to be cleaned and the EPA Final EA

and FONSI do not provide the mathematics and scientific methodology behind the Pahala projected flow rate of 189,000 gallons of wastewater per day.

13)     Further, as required by NEPA regulations, EPA did not consult the Federal agency with specialized expertise in Pahala flooding and did not use their own EPA environmental justice tool to determine the socio-economic impact on a distressed, isolated post-plantation community as was recommended by State Department of Health ("DOH") in the Draft EA comments.

14)     Thus, the EPA decision not to issue an EIS violated NEPA by failing to consider adequately three issues: 1) whether the Pahala project's effects were likely to be "highly controversial" (40 C.F.R. Sec. 1508.27(b)(4) (2019)); 2) the impact of the reasonably foreseeable significant adverse effects of frequent heavy flooding in the local area (40 C.F.R. 1508.27(b)(4) (2019)); and, 3) the environmental-justice effects of the project (40 C.F.R. Sec. 1508.1(g)(1) (2020)).

15)     Finally, Plaintiff claims the EPA did not adequately publish the EPA Final EA and FONSI because the first COVID-19 pandemic restrictions closed the two Ka'u libraries on March 18, 2020 (after only 10 days of availability), which contained the only physical documents for review by the members of a disadvantaged community without the means to access the documents online or in digital formats (such as CDs which require a computer with a drive to read).

16)     When the Ka'u library copies were no longer available for review, Plaintiff directly requested a physical copy because of her vision disability, but David Albright, EPA Region IX official named as the EPA EA contact, refused to send Plaintiff a copy for her personal use.

17)     Unlike the extension of the initial Draft EA comment period to 60 days, EPA and DEM refused to make any alterations in the availability of EA/FONSI documents or in extending the

review period to accommodate for the emergency COVID restrictions, even when asked by Ka'u

County Council member, Maile David, at the request of her constituents from Ka'u.

18)     Plaintiff asks that the Court vacate the deficient agency determination that an EIS is not

warranted and remand to the agency to complete preparation of an EIS.  Or, in the alternative,

remand the matter to the agency to address the three issues (alternatives for wastewater treatment

technologies, foreseeable hazard of Pahala flooding and environmental-justice effects).


## PARTIES

### Plaintiff

19)     PLAINTIFF SANDRA LEE DEMORUELLE, natural-born citizen of the United States

of America, is and, at all times relevant, was a resident of 94-1513 Kaalualu Road, Naalehu in

the District of Ka'u in the County and State of Hawaii living 12 miles from the Pahala FINAL

EA Alternative 7, the planned project site in the *Final Pahala LCC Replacement Project*

*Environmental Assessment* ("FINAL EA") and *Finding of No Significant Impact ("*FONSI").

20)     On September 21, 2018, Plaintiff asked the EPA to be a "Consulting Party" on the

*Pahala LCC Replacement Project Environmental Assessment* at which time she made the

attestation and provided evidence that her aesthetic, recreational, scientific, spiritual, educational

and economic interests have been and will continue to be affected by Defendant's actions.

21)      Plaintiff participated in the extended public comment period for the challenged

*Pahala LCC Replacement Project Environmental Assessment*.

22)     Thus, there is sufficient evidence of Plaintiff's standing in the EPA's

Administrative Record ("AR") and Plaintiff's comments in the AR detail the aesthetic

and other injuries she would suffer that are traceable to the deficient NEPA review of the Pahala project which would be redressed by a favorable decision to vacate and/or remand the EPA FONSI decision by this Court.

23)     Plaintiff received 41 of the same dismissive response, all dated March 6, 2020 from the County of Hawaii Consultant, Wilson Okamoto Corporation, signed by Keola Cheng, Project Manager, to her comments (Final EA Appendix E) on the *Pahala LCC Replacement Project Draft EA,* but none of the comments resulted in anything but "revisions to provide clarity through minor text changes … These revisions do not change any of the key findings presented in the Draft EA." (March 8, 2020, FINAL EA Section 7.3 Page 7-6).

### Federal Defendant

24)     DEFENDANT JANE NISHIDA as Acting Administrator of the United States Environmental Protection Agency, is responsible for EPA agency compliance with the procedural requirements of NEPA.

### BASIS FOR JURISDICTION AND VENUE

25)     This action arises under the laws of the United States and involves the United States as a defendant.  Therefore, this Court has jurisdiction over the claims specified in this Second Amended Complaint pursuant to 28 U.S.C. Secs. 1331 (federal question jurisdiction) and 1361 (action to compel officer or agency to perform a duty owed to the Plaintiff).

26)     This is a civil action for judicial review under Administrative Procedures Act 5 U.S.C. Sec. 701 -706, as the Defendant violated NEPA procedural statutory requirements thereby causing the Plaintiff concrete injuries.

27)     "Ultimately, the purpose of the NEPA process is to ensure informed decision making by Federal agencies with regard to the potential environmental effects of proposed major Federal actions and to make the public aware of the agency's decision-making process.  When effective and well managed, the NEPA process results in more informative documentation, enhanced coordination, resolution of conflicts, and improved environmental outcomes." FR Vol. 85, No. 137 July 16, 2020 43306.

28)     "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.  **The information must be of high quality.  Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA ….**" 40 C.F.R. Sec. 1500.1(b). (2020) (emphasis added).

29)     Where an agency is unsure whether an action is likely to have "significant" environmental effects, it may prepare an EA: a "concise public document" designed to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement….." 40 C.F.R. 1508.9.  If the EA concludes that the action will not have a significant effect on the environment, the agency may issue a Finding of No Significant Impact and may then proceed with the action.  40 C.F.R. 1508.13.

30)     Judicial review of NEPA compliance can occur only under the Administrative Procedure Act ("APA"), 5 U.S.C. 704, "to determine whether, as a matter of law, the evidence in the administrative record supports the agency's decision." *Citizens for Responsibility and Ethics in Wash. ("CREW") v. SEC*, 916 F.Supp.2d 141, 145 (Dist. DC 2013) as cited in *Wildlife Guardians, et al. v. Zinke*, 368 F. Supp.3d 41, 58 (Dist. DC 2019).

31)    Here, Plaintiff requests application of the APA and NEPA laws to the evidence in the administrative record of the case.

32)    Here, Plaintiff argues that "significant consequences" have been ignored by EPA resulting in separate, tangible procedural injuries.

33)    The EPA deficiencies have undermined informed agency decision-making because the County DEM is now wanting to consider less costly decentralized wastewater treatment options.

34)    Under the demands of the EPA, DEM is not free to exercise discretion in assessing these less costly wastewater treatment technology alternatives that were not adequately considered in in the EA because EPA "maintain[s] continuing authority" for enforcing compliance with the Pahala Work Plan milestones. (*See Environmental Protection Information Center ["EPIC"] v. Simpson Timber Co.,* 255 F.3d 1073, 1080 (9th Cir. 2001)).

35)    Because of the EPA failure to follow NEPA procedural rules intended to protect the Plaintiff's concrete interests, she has suffered injuries based on a procedural right test where the decision-making failure to follow NEPA procedural statutes and regulations in preparation of the environmental assessment of the action," the Pahala LCC Replacement Project, EPA was a violation of her procedural rights.

36)    The failure to consider highly controversial effects increases environmental risks due to the Federal Defendant's uninformed decision-making and is the foundation for injury in fact under Article III.

37)    Factually, the EPA is the "ultimate authority" for the NEPA procedures for the Pahala project as the EPA stated on June 7, 2018: "This [Pahala] project triggers the application of the National Environmental Policy Act (NEPA) and numerous Federal cross-cutting authorities including the Endangered Species Act (ESA)."

38)      The Court has jurisdiction in this claim because the remedy available to the Plaintiff for

"concrete injuries" caused by this violation of NEPA statutes would be to require an EIS for the

*Pahala LCC Conversion Project.*

39)      Venue in this case is proper under 28 U.S.C. 1391(e)(1)(B).  A substantial part of the

events and omissions giving rise to this claim occurred in the State of Hawaii.


**STATUTORY AUTHORITY**

40)      The APA permits judicial review of "final agency action for which there is no other

adequate remedy in court." 5 U.S.C. 704.  The APA provides grounds for overturning the

EPA agency action "without observance of [NEPA] procedure required by law." 5 U.S.C.

706(2)(C)-(D).

41)      Under 5 U.S.C. 702:

> A person suffering legal wrong because of agency action, or adversely affected or
> aggrieved by agency action within the meaning of a relevant statute, is entitled to
> judicial review thereof. An action in a court of the United States seeking relief other
> than money damages and stating a claim that an agency or an officer or employee
> thereof acted or failed to act in an official capacity or under color of legal authority
> shall not be dismissed nor relief therein be denied on the ground that it is against the
> United States or that the United States is an indispensable party.  The United States
> may be named as a defendant in any such action, and a judgment or decree may be
> entered against the United States: Provided, that any mandatory or injunctive decree
> shall specify the Federal officer or officers (by name or by title), and their successors in
> office, personally responsible for compliance.

42)      The EPA Pahala project FONSI was the consummation of the NEPA decision-

making process constituting a "final agency action" ripe for judicial review.

43)      The Council on Environmental Quality ("CEQ") issued new regulations, 40 C.F.R. Sec.

1506.13 Effective date of Update to Regulations Implementing the Procedural Provisions of the

National Environmental Policy Act, effective September 14, 2020, **or earlier for ongoing activities and documents.**  Thus, the new (2020) regulations could potentially be applied by EPA retroactively.

## *CEQ REGULATIONS FOR AGENCY DETERMINATION OF NEPA REVIEW*

44)    40 C.F.R. Sec. 1508.27(b) (2019) enumerates ten factors that "should be considered" in assessing NEPA's "intensity" element which triggers the preparation of an Environmental Impact Statement ("EIS").  Implicating any one of the factors may be sufficient to require development of an EIS.

45)    "The degree to which the effects on the quality of the human environment are likely to be highly controversial" is the fourth factor. 40 C.F.R. Sec. 1508.27(b)(4) (2019).

46)    However, the current EPA C.F.R. effective September 14, 2020 (*see* 40 C.F.R. Sec. 1506.13), or earlier for ongoing activities and environmental documents, has purposely excluded consideration of 40 C.F.R. Sec. 1508.27(b)(4) (2019) "controversy" "**because the extent to which effects may be controversial is subjective and is not dispositive of effects' significance**."  FR Vol. 85, No. 137 July 16, 2020 43322.   "Further, courts have interpreted controversy to mean scientific controversy, which the final rule addresses within the definition of effects, as **the strength of the science informs whether an effect is reasonably foreseeable.** The controversial nature of a project is not relevant to assessing its significance." *Id.*[1]

47)    40 C.F.R. Sec. 1501.3(b) (2020) (Determine the appropriate level of NEPA review.) "In considering whether the effects of the proposed action are significant, agencies shall analyze the

---

[1] CEQ also changed "controversy" to "disputed" in 40 C.F.R. Sec. 1502.12 (2020).

potentially affected environment and degree of the effects of the action." "In considering the potentially affected environment, agencies should consider, as appropriate to the specific action, the affected area (national, regional, or local) and its resources…" *Id. Subsection* (1).

48)    "In considering the degree of the effects, agencies should consider the following, as appropriate to the specific action: (i) Both short- and long-term effects. (ii) Both beneficial and adverse effects. (iii) Effects on public health and safety. (iv) Effects that would violate Federal, State, Tribal, or local law protecting the environment." *Id. Subsection* (2).

49)    40 C.F.R. 1508.27(b)(4) (effective September 14, 2020) (Federal Register Vol. 85, No. **7**, July 16, 2020, Pages 43304, 43322) excludes consideration of controversy because, as Council on Environmental Quality states: "the extent to which effects may be controversial is subjective and is not dispositive of effects' significance.

50)    Further, courts have interpreted controversy to mean a scientific controversy, which the final rule addresses within the definition of effects, *as the strength of the science informs whether an effect is reasonably foreseeable.* (emphasis added) The controversial nature of a project is not relevant to assessing its significance."

51)    However, a comparison of the changes made to the "methodology" regulation illustrates that the requirement for scientific accuracy remains unchanged:

*40 C.F.R. Sec. 1502.24 (2019) Methodology and scientific accuracy. Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environment impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.*

*40 C.F.R. Sec. 1502.23 (2020) Methodology and scientific accuracy. Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environment documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An*

*agency may place discussion of methodology in an appendix. Agencies are not required to
undertake new scientific and technical research to inform their analyses. Nothing in this section
is intended to prohibit agencies from compliance with the requirements of other statutes
pertaining to scientific and technical research.*

52)    Thus, the revised C.F.R. environmental consequences section (1502.14) now forms the

**scientific and analytic basis for comparison of alternatives**.

53)    In this case, the EPA failed to explain the science behind the Pahala wastewater flow of

189,000 gallon per day and how that flow-rate affected the selection of the technology alternative

that would meet the EPA "need" to close the Pahala LCCs as quickly as possible.

54)    Now the revised 40 C.F.R. 1508.1(g) (2020) definition of "effects" is *"[e]ffects or impacts*

means changes to the human environment from the proposed action or alternatives that are

reasonably foreseeable and have a reasonably close causal relationship to the proposed action or

alternatives, including those effects that occur at the same time and place as the proposed action

or alternatives and may include effects that are later in time or farther removed in distance from

the proposed action or alternatives."

55)    40 C.F.R. Sec. 1508.1(g)(1) (2020) states: "Effects include ecological (such as the effects

on natural resources and on the components, structures, and functioning of affected ecosystems),

aesthetic, historic, cultural, economic (such as the effects on employment), social, or health

effects. Effects may also include those resulting from actions that may have both beneficial and

detrimental effects, even if on balance the agency believes that the effect will be beneficial."

56)    The reason the effects are "highly controversial" is because the Draft EA public

comments are not against doing the Pahala original sewage line replacement and the EPA-

required (40 CR 144.88) sewage treatment project [which started as a simple septic conversion

project], there is just a great controversy among governmental and community-based experts, as

well as Draft EA comments (Appendix E) by numerous local residents over the flow rate, the

flooding in Pahala, and the environmental justice and costs of the action to the individual Pahala

households and the COH taxpayers.

57)    Under the old C.F.R., "controversial" was held in *Town of Cave Creek v. FAA*, to refer to

situations where 'substantial dispute exists as to the size, nature, or *effect* of the major federal

action.' 325 F.3d 320, 331 (D.C. Cir. 2003) (quoting *North American Wild Sheep v. U.S.*

*Department of Agriculture,* 681 F.2d 1172, 1182 (9th Cir. 1982) (emphasis in original).

58)    Further, as explained in *Fund for Animals v. Frizzell,* "certainly *something more* is

required" for a highly controversial finding "besides the fact that some people may be highly

agitated and be willing to go to court over the matter." 530 F.2d 982, 988 n. 15 (D.C. Cir. 1975)

(per curiam) (emphasis added).

59)    Here, in contrast, Plaintiff has expressed more than passionate opposition and has

provided well-reasoned and thoughtful criticism of EPA's defects in methodology and "[m]any

courts have found 'something more' to be scientific or other evidence that reveals flaws in the

methods or data relied upon by the agency in reaching its conclusions." *National Parks*

*Conservation Association v. Semonite*, 311 F.Supp.3d 350, 363 (Dist. D.C. 2018).

60)    In their comments on the Pahala project EA documented in the Appendix of the Final EA,

Plaintiff, highly specialized governmental agencies, other scientific and cultural experts and local

affected organizations cast substantial doubt on the adequacy of the EPA's methodologies and

conclusions, which constitutes serious outside criticism that demonstrates controversy and

uncertainty that the EPA EA and FONSI fail to resolve in the analysis.

61)     The question before the Court asks if the EPA has, through the strength of its response, convinced the Court that it has materially addressed and resolved serious objections to its EA/FONSI analysis?

62)     Therefore, EPA must have cogently explained in the Pahala project EA/FONSI why it has exercised its discretion in a given manner, particularly in the selection of a preferred alternative wastewater treatment technology that would close Ka'u LCCs in the fastest timeframe.

## PROJECT BACKGROUND

63)     Plaintiff stipulates to the accuracy of the facts in the EPA FONSI *Project Background* and *Purpose and Need for Action* sections concluding that the project "is a major federal action requiring compliance with NEPA in accordance with 40 C.F.R. Sec. 1508.18 [2019]," and need not repeat the background facts here.

## GENERAL FACTS REGARDING THE PAHALA PROJECT (THE FONSI "ACTION")

64)     The two currently County-owned LCCs in Pahala are injection wells regulated by the State Underground Injection Control ("UIC") program established under the Safe Drinking Water Act ("SDWA") in 1974.

65)     The original (2007 Final EA) Pahala project plan was environmental-review-exempt on-site septic conversion utilizing the current Underground Injection wells as seepage pits under a variance granted by DOH (April 2004 Docket No. 03-VWW-06).

66)     The EPA accepted the 2007 septic conversion plan to close the LCCs and, on January 4, 2011, approved the payment of $133,853 of County of Hawaii's contact Robin Bauman's

$207,006 requested for "EFT # 90204 U.S. EPA Payment Request of November 5, 2010" under the *Naalehu and Pahala Villages LCC Conversion Project* Grant.

67)    In 2019, DEM closed the Pahala LCC at the Senior Housing with a septic conversion costing $413,000, that was exempt from environmental review because it was a facility renovation, not done at a new site.

68)    As the State DOH/UIC had issued a variance in 2007 for the continued use of the Ka'u injection wells for the septic tank treated effluent, the State has or should have knowledge that the County has been using the same injection wells for raw sewage disposal since the septic tanks were not installed in 2008 as projected in the 2007 Pahala project Final EA and State DOH has not enforced UIC regulations and requirements between 2007 and present, 2021.

69)    Given the circumstances of the isolation of the community and the low wastewater flow, there is no reason to believe that State DOH would not re-issue the variance and again allow use of the current UI wells for immediate conversion to septic, mooting this claim and any need for further environmental review.

70)    Plaintiff acknowledges she would instantly withdraw this suit and stipulate that on-site septic conversion or other sewage treatment technologies (such as modular options) falls under both Hawaii and NEPA exemption status, and the project could be moved forward to provide Pahala LCC closure without any further delay.

## CLAIM FOR RELIEF

I.    CLAIM FOR RELIEF – VIOLATIONS OF NEPA

   A.  **Failure to Publish the Final EA**

71)    Plaintiff hereby incorporates all the allegations contained in paragraphs 1 through 70

above.

72)    The DRAFT EA comment period was extended to accommodate the public comments.

73)    However, few people in the affected community had an opportunity to review those

comments and read the FONSI because no accommodation was made for public access when the

Hawaii State and County COVID-19 pandemic restrictions were first placed in March 2020.

74)    New information in the EA Appendix was never provided to the public for review because

the only physical sites, including the Pahala Library, with the EPA Final EA/FONSI documents

suffered March 2020 COVID-19 related closures.

75)    Regarding COVID-19 pandemic on public involvement, CEQ stated: "Agencies consider

many factors in determining the most appropriate mechanism for promoting public involvement,

including the particular location of the proposed action (if one exists), the types of effects it may

have, and **the needs of interested and affected parties, and may design their outreach in a

manner that best engages with those parties**.  The flexibility to consider relevant factors is

critical especially in light of unexpected circumstances, such as the COVID-19 pandemic, which

may require agencies to adapt their outreach as required by State, Tribal, and local authorities and

conditions. FR Vol. 85, No. 137 July 16, 2020 43338.

76)    Plaintiff claims the EPA did not adequately publish the EPA Final EA and

FONSI because the first COVID-19 pandemic restrictions closed the two Ka'u

libraries on March 18, 2020 (after only 10 days of availability), which contained

the only physical documents for review by the members of a community without

the means to access the documents online or in digital formats (such as CDs

which require a computer with a drive to read).

77)    When the Ka'u library copies were no longer available for review,

Plaintiff directly requested a copy because of her vision disability, but David

Albright, EPA Region IX official named as the EPA EA contact, refused to send

Plaintiff a copy to use.

78)    Unlike the extension of the initial Draft EA comment period to 60 days,

EPA and DEM refused to make any alterations in the availability of EA/FONSI

documents or in extending the review period to accommodate for the emergency

COVID restrictions, even when asked by Ka'u County Council member, Maile

David, at the request of her constituents from Ka'u.

79)    The EA Appendix contained public and governmental comments with detailed

information concerning significant environmental impacts that was not properly made available to

the public, who were therefore denied their role in the NEPA process and implementation of the

FONSI decision.

80)    On a personal level, the rural, economically vulnerable former plantation workers who

participated under NEPA procedures were effectively denied the opportunity to review their own

and other people's comments when the Ka'u libraries closed under COVID restrictions first

imposed in March 2020.  As Dale Carnegie (*How to Win Friends and Influence* People, 1936)

tells us, people love to hear [and see] their own names, and were unable to review all the

comments in the new information in the Final EA Appendix.

81)     As a major stated goal, the CEQ 2020 EPA C.F.R. revisions sought to make Federal

environmental review information ever more available to the public. (*See, e.g.* "Making this

change ensures that the EA is available to the public." FR Vol. 85, No. 137 July 16, 2020 43324).

82)     In 40 C.F.R. Sec. 1503.1 (c) (2020), CEQ required agencies "to provide for commenting

using electronic means while ensuring accessibility to those who may not have such access to

ensure adequate notice and opportunity to comment." *Id.* at 43333. ("An agency shall provide for

electronic submission of public comments, with reasonable measures to ensure the comment

process is accessible to affected persons.").

83)     Further, the revised 40 C.F.R. Sec. 1506.6 (2020) Public Involvement, requires "agencies

to consider interested and affected parties' access to electronic media, such as in **rural locations**

**or economically distressed areas."** FR Vol. 85, No. 137 July 16, 2020 43371.  (Section 1506.6

(b) and (c) "When selecting appropriate methods for providing public notice, agencies shall

consider the ability of affected persons and agencies to access electronic media.").

84)     In the 2020 regulations, CEQ required Federal agencies like EPA to explain "in its

procedures where interested persons can get information or status reports on environmental

impact statements and other elements of the NEPA process."  *Id.*

85)     The parties interested in the Pahala project NEPA process and the EA with FONSI were

told the only physical access to the hard copies of the physical documents were at the Naalehu

and Pahala Libraries, which closed on March 18, 2020, short 20 days of the allotted 30-day

review period, because of COVID-19 restrictions and no other provisions were made by EPA to

accommodate the rural, economically distressed local area residents' review of the new

information contained in the EA Appendix, including their own comments.

86)      Thus, EPA denied the interested and affected public the opportunity for contemporaneous
public involvement in March 2020.

87)      The Court must "… strictly interpret the procedural requirements in NEPA and the CEQ
regulations 'to the fullest extent possible' consistent with the policies embodied in NEPA.
'[G]rudging, pro forma compliance will not do."   *Churchill County v. Norton*, 276 F.3d 1060,
1072 (9th Cir.  2001) quoting *Lathan v. Brinegar*, 506 F.2d 677,687 (9th Cir. 1974) (*en banc).*

### B.  Failure to Insure Integrity of Methodology and Analyses

88)      Plaintiff hereby incorporates all the allegations contained in paragraphs 1 through 87
above.

89)      Among her EA comments, Plaintiff criticized the EPA for using incorrectly calculated
wastewater flow rate in Pahala.

90)      NEPA requires agencies to use high quality, accurate scientific information and to ensure
the scientific integrity of the analysis.  40 C.F.R. Sec. 1500.1(b), 1502.24.

91)      Thus, there is "scientific or other evidence that reveals flaws in the methods or data relied
upon by the agency in reaching its conclusions."  *National Parks Conservation Association v.
United States*, 177 F.Supp.3d 1, 33 (Dist. DC 2016).

92)      EPA failed to engage in a quantitative evaluation of the Pahala wastewater flow rate by
providing the methodology used for calculation of the rate of 189,000 gallons per day.

93)      In order to select from the alternatives using an analysis that incorporates a reasoned
weighing of the evidence, accurate flow rate is essential data.

94)    In the EA and FONSI, EPA failed to consider the actual current requirements of the

Pahala wastewater flow and the water quality standards of the treated effluent, which are the two

factors that determine the available technology for feasible types of wastewater treatment and the

capital and operational costs of each.  The actual "flow" was randomly selected (since no

explanation is provided in either the FINAL EA document or the *November 2019 Preliminary

Engineering Report* ("PER") in Appendix B, Section 2.2 Flow Projections Page 2-3 "Wastewater

flow projections were developed using the City and County of Honolulu's (CCH) current (2017)

wastewater standards.  Table 2-1 summarizes the flow projections."  "Average dry weather flow"

was stated as being "189,000 gallons per day" with peak flows of 662,000 gallons per day and

630 gallons per minute [or 907,200 gallons per day] with no identification of the methodologies

used as required by 40 CR 1502.24 to insure professional and scientific integrity of the

discussions and analyses.

95)    Given the 177 households that will be affected, the 2017 CCH standards (Chapter 2

Section 2.2 Quantity of Wastewater) for scientifically calculating the ultimate Pahala flow would

be: 4 persons per household (CCH 2.2.2 B) each using 70 gallons per day (CCH 2.2.2 A.) or 4 X

177 X 70 = 49,560 gallons per day.  Using the EPA projected flow of 189,000 would require a

population of 2,700 (2700 people X 70 gallons/day) and there is no planned expansion from the

current level of 708 people (177 households X 4 people).

96)    In her DRAFT EA comments, Plaintiff requested consideration of the factual demand of

the wastewater "flow" as it directly affects the choice of technology and the cost of the project.  In

fact, CCH standards required the consideration of far more flow rates than were ever considered

by the engineering reports and the FINAL EA final results and include, *inter alia*: Base Sanitary

Flow (BSF);  Peak Base Sanitary Flow (PBSF); Average Dry Weather Flow (ADWF);

Groundwater Infiltration (GWI); Peak Dry Weather Flow (PDWF); Wet weather

Infiltration/Inflow (I/I) and Design Flow ($Q_{DES}$) which is the sum of the peak dry weather flow

and wet weather I/I.  The low flow must be considered as Plaintiff Comment #6 pointed out to the

proponent (Appendix E).

97)    If the EPA required "Special Considerations" for case-specific flow assessment, it needed

to be disclosed in the FINAL EA with the computations provided.

98)    The EPA failed to provide the existing sewers design flow with the CCH flow rates to

determine the current requirements upon which to base the future projections.  There was no

study of the current wastewater system to determine the actual flows from the service area.

99)    Not citing the source of this information, the FINAL EA states: "It should be noted that

wastewater flows from a community are highly variable, and peak flow rates from small

community wastewater collection systems are typically three to five times higher than the average

flow rates." (*Id*. Page 2-11).

100)    If the flows require "Special Considerations," this calculation should be shown and the

authority for the exception cited in full in the EA.

101)    Since EPA did not adequately quantify the Project's needs for the flow-rate, it failed to

provide the factual information necessary for the public and agency decisionmakers to understand

the actual needs and set realistic goals to permit rational selection of the alternative.

## C. **Failure to Consider Prospective Significant Environmental Harms**

102)    Plaintiff hereby incorporates all the allegations contained in paragraphs 1 through 101 above.

103)    EPA improperly failed to consider the prospective significant harms of extreme Pahala flooding.

104)    NEPA required EPA to conduct a more piercing consideration of the consequences of floods by consulting the Federal agencies with special scientific expertise in these areas and this Pahala location.

105)    The preferred Pahala project Site 7 is subject to extreme flooding and there is general severe flooding in the Pahala area which is highly controversial because the United States Geological Survey ("U.S.G.S.") was not consulted, nor USGS topographic maps used.  USGS is the Federal agency with specialized expertise that wrote the Nov 1-2, 2000 Pahala flood study.

106)    The pre-assessment notification response from State of Hawaii Department of Land and Natural Resources (Final EA Section 3.9.1 Page 3-14) "stated the responsibility for conducting research as to the flood hazard designation for the project site lies with the project proponent."

107)    Given the number of bridges in the Pahala area that have required repair through the past 20 years, adequate research by the proponent would have revealed the United States Geological Survey Water Resources Investigations Report 02-4117, *Streamflow and Erosion Response to Prolonged Intense Rainfall of November 1-2, 2000, Island of Hawaii*, with Figure 1 showing the topographic contours that make Pahala a "high rainfall area" with steep slopes gathering

rainwater causing the erratic extreme flooding that the local residents warned EPA about in their

Draft EA comments in Appendix E.

108)    The EPA FONSI entirely failed to consider the important aspect of the highly

controversial problem of the area-wide extreme flooding on the technology and siting decisions

made on the SAAP Grant-funded Pahala project.

109)    A flood culvert goes under Mamalahoa Highway (Highway 11) from a channel adjacent to

the east side of the proposed Project Site 7.

110)    Plaintiff commented that the EPA must consider both the probabilities of potentially

harmful events and the consequences if those events come to pass.  The FONSI was not

appropriate because the Federal agency with expertise (U.S.G.S.) did not place the Pahala site's

grave harm probability as so low as to be remote and speculative.

111)    Doing away with the obligation to prepare an EIS whenever a project presents a low-

probability risk of very significant consequences would wall off a vast category of major projects

from NEPA's EIS requirement.

112)    Here, the flooding risk is sufficient "that a person of ordinary prudence would take it into

account in reaching a decision" to approve the need for an EIS for the Pahala project, and its

potential consequences should have been analyzed in the EPA FONSI.


### D.  Controversy related to Arbitrary Economic and Environmental Justice Analyses


113)    Plaintiff hereby incorporates all the allegations contained in paragraphs 1 through 108

above.

114)    The largest area of scientific controversy is the environmental justice analysis because a highly specialized governmental agency, State of Hawaii Department of Health-Environmental Planning Office ("DOH-EPO") recommended use of the EPA's own environmental justice assessment tool, the EJSCREEN in the Draft EA commentary, with no consideration given to this in the Final EA/FONSI.

115)    Because EPA failed to use the EPA EJSCREEN, EPA also failed to use the EPA SAAP Grant to build capacity and get "on-the-ground results for communities."  (USEPA Region 9 Fiscal Year 2015 Action Plan to Address Environmental Justice (EJ): *USING OUR GRANTS PROGRAMS TO ADDRESS EJ* Section 34 - utilization of EJSCREEN to areas with greatest need and community concerns).

116)    The Final EA denial that Pahala is an "overburdened" community is based solely on the 2016 American Community Survey and is highly controversial because in Appendix A the DOH-Environmental Planning Office ("DOH-EPO") expert Laura Leialoha Phillips McIntyre, AICP, recommended use of the EJSCREEN in Draft EA Pre-assessment Consultation comments dated April 3, 2018.

117)    DOH-EPO stated: "To better protect public health and the environment, the U.S. Environmental Protection Agency (EPA) has developed an environmental justice (EJ) mapping and screening tool called EJSCREEN.  It is based on nationally consistent data and combines environmental and demographic indications in maps and reports."

118)    There was no response to this recommendation in the June 21, 2018 Response to Comment letter to the DOH-EPO.

119)    The EA acknowledges Pahala has the population Plan EJ 2014 terms "overburdened" to describe the aging, minority, low-income community that potentially experience disproportionate environmental and economic harms and risks due to effects' impacts.

120)    EPA did not incorporate the "public viewpoints and preferences" in the Pahala Final EA and FONSI, which demonstrates that the communities' Draft EA comments were not considered by the decision-making officials who were driven to justify the pre-selected "Alternative 7."  (40 CR 25.3 (b)).

121)    Under 40 C.F.R. 25.4 (d), *Public consultation* "means an exchange of views between governmental agencies and interested or affected persons and organizations in order to meet the objectives set forth in Section 25.3."  *Id.*.

122)    Establishing the "highly controversial criteria" (40 C.F.R. 6.200(a)) is less clear in this case as there is no "battle of experts" because remote and tiny Ka'u has no friends in high places such as the Standing Rock Sioux Tribe has in the Dakota Access Pipeline controversy.

123)    The University of Hawaii Center on the Family's Community Profile on the well-being of Ka'u refers to many challenges that historically have the Ka'u community ranked lowest and worse off than Pahoa and Laupahoehoe on Hawaii Island and McKinley, Nanakuli and Wai'anae on Oahu. (UH College of Tropical Agriculture and Human Resources, *Community Profiles Series*, October 2018).

124)    Being few in number [about 8,000 people live in the whole Ka'u District], the members of the community are without power, so the Ka'u community comments in Appendix E were totally without effect on the Final EA results.

125)    Lacking community members with expertise and with extraordinarily limited access to technical and legal resources, the Ka'u community can only provide the collective wisdom of the

community's Draft EA comment to point out to the DEM experts' analyses of the significance of impacts on the human environment, the need to consider economic impact on residents and the County of Hawaii fiscal resources; the actual flow rate and water quality standards of the effluent (which drive the choice of technology and facility costs); and problems with siting in a Pahala extreme flood zone as shown on USGS topographic maps.


## **REMEDY**


126)    This U.S. District Court is positioned to make factual findings and determine is what remedy is appropriate to redress the NEPA violations.

127)    Plaintiff requests that the Court vacate the deficient EPA determination that an EIS is not warranted and remand to the EPA to complete preparation of an EIS.

128)    Order EPA to prepare an EIS where, as here, it failed to make a *convincing case* that an EIS is unnecessary as this case presents 'precisely' the circumstances in which Congress intended to require an EIS, namely, 'where, following an environmental assessment, the scope of a project's impacts remains both uncertain and controversial.' [*National Parks* 916 F.3d] at 1087-88.  As well, the 'context' of this case  --  a small, isolated rural post-plantation community with limited resources requiring adequate environmental justice analysis -- weighs in favor of requiring an EIS.

129)    Or, in the alternative, Plaintiff requests that the Court remand the matter to the agency to address the "effects" issues.

**REQUESTED RELIEF**

130)    WHEREFORE, Plaintiff Sandra Demoruelle requests that the Court award her the following relief:

(A)    Adjudge and declare that the EPA did not adequately discharge its duties for environmental review of the Pahala Final EA FONSI decision published on March 8, 2020, and that the decision is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under APA and NEPA;

(B)    Order EPA to do a more stringent review of the environmental impacts of the Pahala project to include the completion of an EIS based on current Ka'u wastewater flow-rates.

(C)    Enter other appropriate relief to ensure that the Defendant complies with NEPA and APA and prevent irreparable harm to the Plaintiff and to the environment until such compliance occurs;

(D)    Retain jurisdiction of this matter until Defendant has fulfilled its legal and Court-ordered obligations as set forth in this Second Amended Complaint;

(E)    Award Plaintiff costs and reasonable attorney's fees, as incurred in this action;

(F)    Grant such other relief as the Court may deem just and proper.

**CERTIFICATION AND CLOSING**

131)    Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper

purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) is supported by existing law or by non-frivolous argument for extending, modifying, or

reversing existing law; (3) the factual contentions have evidentiary support and the complaint

otherwise complies with the requirements of Rule 11.

132)     I agree to provide the Clerk's Office with any changes to my address where case-related

papers may be served.  I understand that my failure to keep a current address on file with the

Clerk's Office may result in the dismissal of my case.


Dated: February 27, 2021, at Naalehu, Hawaii

Plaintiff:


SANDRA L. DEMORUELLE, *Pro Se*

CASE NO. CV20-00147 LEK-RT  *DEMORUELLE v. NISHIDA*

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY THAT, on this date and by the method of service noted below, a true and correct copy of the Plaintiff's Second Amended Complaint was served on Defendant's Counsel: <u>Served via email and US mail.</u>

Davene D. Walker
Trial Attorney
United States Department of Justice
Environmental and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611

DATED: February 27, 2021, signed in Naalehu, Hawaii

Plaintiff

SANDRA L. DEMORUELLE, *Pro Se*